FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

02 SEP 30 PM 3: 03

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| LENORA GOODWIN, BETTY McCOY-ABERCROMBIE, WANDA JACKSON LEVINS and LATISHWA TURNER | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action Number 00-C-2610-S |
| v. | ) ) | |
| FIRST EDUCATORS CREDIT UNION, THE BOARD OF DIRECTORS and STEVE NIX, | ) ) ) ) | |
| Defendants. | ) | |

ENTERED
SEP 30 2002

## MEMORANDUM OPINION
### GRANTING PARTIAL SUMMARY JUDGMENT TO DEFENDANTS

The present action was initiated by three black former employees of defendant, First Educators Credit Union ("FECU"). All Plaintiffs seek to hold FECU, its President, Steve Nix, and the FECU Board of Directors liable for the following employment based claims: (1) Section 1981 and Title VII racially disparate treatment, 42 U.S.C. § 1981; 42 U.S.C. § 2000e, (2) Section 1981 and Title VII retaliation, (3) negligent supervision, training and retention under Alabama law, and (4) the tort of outrage under Alabama law.[1] (Doc. 7, Amended Compl.) Presently before the Court are various motions filed by the parties. For the reasons which follow,

---

[1] Based on their reply brief/motion, Plaintiffs have abandoned the outrage claim. (Doc. 59 at p. 1.)

1

the Court will grant some of the motions, in whole or in part; and it will deny other motions.

## I. BACKGROUND FACTS

FECU has five branch offices and employs approximately twenty-nine to thirty employees. At all relevant times, FECU had an Equal Employment Opportunity policy, a sexual harassment policy/complaint mechanism, and a general employee complaint mechanism, but no employment discrimination complaint mechanism. (Nix. Dep. at pp. 108-22; Nix Aff. at Ex. A, FECU Bates Nos.144, 148-49.) In addition, FECU did not provide diversity training or training in equal employment opportunity laws. (Nix Dep. at pp. 108-22; Nix Aff. at Ex. A, FECU Bates #144.)

Steve Nix ("Nix"), who is white, is the President of FECU. He has been the president since 1988, (Nix Dep. at pp. 19, 33), and his office is located at the Birmingham branch office. (*See Id*. at pp. 34-35.) According to FECU, Nix "was the person who decided how much employees were compensated and made the decisions regarding the hiring, transfer, promotion and termination of all FECU employees." (Def.'s Amended Br. at p. 2, ¶ 3.)

Prior to March 2000, FECU did not post job vacancy notices, (*see* Goodwin Dep. at p. 126), because of the credit union's small number of employees. (Nix Dep. at pp. 89-90.) Nix testified that such notices were unnecessary because the employees knew when vacancies occurred. (*Id*. at pp. 89-90.) Nix also testified that FECU did not maintain a file with written job descriptions. (*Id*. at p. 122.) Instead, the FECU had "job descriptions that [it] kind of [went] by" because the FECU was a small institution and often employees performed their own job duties, in addition to the job duties of other employees. (*Id*. at pp. 122-23.)

Tabitha Stanley ("Stanley"), a white former teller, testified that during her employment

with FECU she heard Nix refer to one of the FECU members as a "nigger." (Stanley Dep. at pp. 72-90.) In addition, Stanley testified that two FECU supervisors, Jacqueline Douglas ("Douglas") and June Pike ("Pike"), told "racial jokes" at work. (*Id.*)

## II. CLAIMS COMMON TO ALL OF THE PLAINTIFFS

**A.     Claims Asserted Against the FECU Board of Directors & FECU President Nix.**

All Plaintiffs have asserted claims against FECU's Board of Directors and Title VII claims against its President Nix. The Board and Nix argue that such claims are not actionable. However, Plaintiffs failed to respond to Defendants' arguments. Thus, Plaintiffs are deemed to have abandoned these claims. *See Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (noting that "a ground not pressed in the district court in opposition to a motion for summary judgment is to be treated by the district court as abandoned") (citation omitted).

**B.     Disparate Pay Claims.**

While Plaintiffs allege that they were not compensated at the same rate as similarly situated white employees, Plaintiffs have pointed out nothing in the record which supports these claims. (*See* Doc. 60, Pls.' Amended Br. at pp. 17, 2-9.) A non-moving party cannot rely on conclusory statements or conjecture to overcome a motion for summary judgment. *Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989). Accordingly, summary judgment on Plaintiffs' pay claims is required.

3

C.     **Retaliatory Discharge Claims**.

All four Plaintiffs allege that FECU terminated them in retaliation for filing EEOC charges against the defendant credit union. (*See* Doc. 60, Pls.' Amended Br. at pp. 19.) Plaintiff Betty McCoy-Abercrombie ("McCoy") admitted that she resigned after obtaining employment with another financial institution. (McCoy Dep. at pp. 130, 133-34, 136.)

Plaintiff Lenora Goodwin ("Goodwin") says that on September 20, her supervisor gave Goodwin a copy of FECU's newly implemented employee manual and told her to sign a form acknowledging receipt of the manual by the end of the day. (Goodwin Dep. at pp. 178-79.) The supervisor then left the room. Goodwin worked the remainder of the day and the following day, but did not sign the acknowledgment form. On September 22, Goodwin signed the form "under duress." According to Goodwin, the supervisor responded by indicating that the duress qualification was "unacceptable," and the supervisor explained that she was "not making [Goodwin] sign [the form] under duress." (*Id*. at pp. 180-85.) The supervisor also indicated that Goodwin should not report to work on Monday. However, the supervisor never used the word "terminated" or any similar terminology. (*See id.* at p. 185.)

The following week FECU informed Goodwin that she had been placed on paid administrative leave, pending resolution of the dispute over the acknowledgment form. (*See id*. at pp. 186-87.) On a Friday, Goodwin returned to work, accompanied by her attorney and another Plaintiff. Goodwin signed the acknowledgment form and, as she admitted in her deposition, she was instructed to return to work the following Monday. However, she failed to

4

return to work because the thought of returning to work was too stressful.[2] (*Id.* at pp. 188-90.)

Like Goodwin, Plaintiff Latishwa Turner ("Turner") was told not to return to work and initially placed on paid administrative leave after refusing to sign the same acknowledgment form. (Turner Dep. at pp. 164-66, 168-70, 172-74; Pike Aff. at ¶ 11.) In her deposition, Turner admitted that the supervisor never stated that Turner was fired. (Turner Dep. at p. 173.) Sometime later, Turner returned to the credit union, along with her attorney and Goodwin. Turner signed the acknowledgment form and, like Goodwin, was told to report to work on the following Monday. (*Id.* at p. 175-78.) Like Goodwin, Turner failed to return to work that following Monday. Instead, Turner later called the credit union indicating that she had been under the care of a physician for work related stress. Yet, she never returned to work. (*Id.* at pp. 178-80.)[3]

Wanda Jackson Levins ("Levins") alleges that she was discharged for alleged "outages"

---

[2] Goodwin's deposition testimony conflicts with her later affidavit testimony. In her affidavit, Goodwin claims that she was initially informed that she was "terminated because [she] would not sign the new handbook.... [Later d]espite ... signing the handbook, [she] was inexplicably terminated." (Pls.' Ex. 42 at ¶ 4.) Given the inherent conflict between the deposition testimony and the affidavit testimony, Goodwin cannot rely on the latter to create an issue of material fact. *See Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987) (noting that later affidavit testimony does not create a genuine issue of material fact where the affidavit testimony inherently conflicts with the prior deposition testimony); *Van T. Junkins and Associates, Inc.* v. *U.S. Industries, Inc.*, 736 F.2d 656 (11th Cir. 1984) (explaining that the trial court may disregard later inconsistent affidavit testimony where the witness fails to explain the inconsistency).

[3] Like Goodwin, Turner submitted a post-deposition affidavit explaining that she too had been inexplicably terminated after she signed the acknowledgment form. (Pls.' Ex. 45.) The Court finds that Goodwin cannot rely on her affidavit testimony to create a genuine issue of material fact because the statements in Goodwin's deposition and affidavit are inherently inconsistent. *See Rollins*, 833 F.2d at 1530.

(i.e., failing to balance her teller drawer) after she filed her EEOC charge in May 2000. (*See* Doc. 60, Pls.' Amended Br. at pp. 5-6.) In response to her *prima facie* case, FECU has articulated legitimate non-discriminatory reasons for terminating Levins. FECU maintains that it discharged Levins because she had more outages than the other tellers, who were employed during the same period, and because she failed to complete outage reports. (Pike Aff. at ¶ 7; *see* Levins Dep. at pp. 87-90, 93-95.) Levins does not disputed that FECU required all tellers to complete outage reports and that she did not always complete these reports. (*Id.* at pp. 88-90.) When she was counseled about her excessive outages and her failure to complete the outage reports, Levins refused to sign a form acknowledging disciplinary action. (Pike Aff. at ¶ 7; Levins Dep. at 93-95.) FECU in turn terminated her. (Pike Aff. at ¶ 7; Nix Aff. at ¶ 16.)

Levins has not shown any similarly situated white employee who was treated more favorably. Put another way, she has not shown a single white employee who either failed to complete outage reports and/or failed to sign a notice of disciplinary action. Thus, Levins has not shown that the articulated reason for her discharge was pretextual.

Given these undisputed facts, Defendants are entitled to judgment as a mater of law on the retaliatory discharge claims made by all four Plaintiffs.

D.   **Negligent Training, Supervision, and/or Retention Claims.**

Under Alabama law, to establish a claim for negligent training, supervision and retention, Plaintiffs "must show that the alleged incompetence of the employee was actually known to the employer or was discoverable by the employer if it had exercised care and proper diligence." *Portera v. Winn Dixie of Montgomery, Inc.*, 996 F. Supp. 1418, 1438 (M.D. Ala. 1998) (citing

6

*Ledbetter v. United Am. Ins. Co.*, 624 So. 2d 1371 (Ala. 1993)). Plaintiffs allege that Nix and other supervisors engaged in discriminatory conduct and that FECU failed to provide training in equal employment opportunity laws. More importantly, Plaintiffs alleged that once FECU learned of the alleged racial discrimination, the credit union "took no genuine steps toward investigating the conduct or correcting the problems." (*See* Doc. 60, Pls.' Amended Br. at p. 20.) These conclusory allegations, alone, are not sufficient to survive summary judgment.

      First, Alabama law does not require employers to provide equal employment opportunity training in an effort to avoid negligent training/supervision claims. *See Potera*, 996 F. Supp. at 1438 (citation omitted). Additionally, Plaintiffs have not directed the Court to any evidence that FECU failed to act or that its investigation of the alleged misconduct was insufficient under Alabama law. (*See* Doc. 60, Pls.' Amended Br. at p. 20.) Rather than pointing out and relying on evidence in the record, Plaintiffs merely make unsupported allegations about the insufficiency of FECU's efforts. Plaintiffs cannot survive summary judgment by relying on conjecture alone. *See Peppers*, 887 F.2d at 1498.

E. **Failure to Train and Failure to Post Job Vacancies**

      All four Plaintiffs complain that white employees received favorable treatment with respect to cross-training opportunities and opportunities to move into new job positions. According to Plaintiffs, FECU frequently cross-trained white tellers by allowing them to perform duties in other departments. In addition, FECU transferred white tellers from the teller line to positions where the white employees gained job skills that FECU valued more highly than the

skills required of tellers. [4] Summary judgment on this issue must be denied because of disputed facts.

FECU transferred Brooke MacMillan to the accounting department, Brent Lowery to member services, and Anna Kushner to the loan department without posting job vacancy notices. Indeed, FECU did not begin posting job vacancies until March 2002.[5] (*See* Goodwin Dep. at p. 126.)

Whether, as Defendants contend, all employees nonetheless knew of job vacancies is clearly an issue of fact. Thus, summary judgment is not appropriate. *See Roberts v. Gadden Memorial Hosp.*, 835 F.2d 793, 797 (11th Cir. 1988) (noting that a plaintiff may raise an inference of discrimination where the employer used informal or secretive selection procedures and finding that the employer had a duty to consider the plaintiff for a promotion where the plaintiff was not privity to word of mouth communications about an available position). [6]

### III. LENORA GOODWIN'S ADDITIONAL CLAIMS

Plaintiff Goodwin has asserted four specific claims in addition to the claims common to all Plaintiffs: 1) disparate treatment and retaliation related to an alleged theft, 2) disparate treatment with respect to a posted share draft accounting position, and (3) disparate treatment with respect to the duties and work area of the records clerk.

---

[4] The Court notes that inherent in this claim is the contention that the transfers of black employees were to positions which did not involve highly valued skills.

[5] Plaintiffs also challenge additional job vacancy transfers that were not posted.

[6] Of course, to the extent a Plaintiff admitted that she was aware of a non-posted position and failed to apply for it, summary judgment is appropriate. The record is unclear regarding whether several job transfers that McCoy challenges were posted.

A.     **The Alleged Theft**.

During her employment with FECU, Plaintiff Goodwin worked in positions which gave her access to the computerized records containing members' account numbers. (*See* Douglas Aff. at ¶¶ 4,6; Douglas Dep. at pp. 83, 89.) In the fall of 1999, someone completed an authorization card for the purpose of adding an "Arthur Mayfield" to the account of FECU member Julia Mayfield. Ms. Mayfield had not actually authorized the change. (*Id*. at pp. 79-82.) All of the employees have access to such cards and FECU has no evidence that Goodwin was involved in the unauthorized change. (*Id*. at. p. 82.) Sometime later, Goodwin entered the new account information into the computer and changed the Mayfield account mailing codes. (Douglas Aff. at ¶ 6; Douglas Dep. at pp. 61-62, 71-72, 81-82, 84.) Because McCoy added Arthur Mayfield to the account without verifying the change, she violated FECU procedures. (Douglas Dep. at p. 108, 113.)

Subsequently, several other suspicious activities occurred with respect to the Mayfield account. In one instance, a white employee issued an ATM card to Arthur Mayfield, without obtaining an ATM disclosure agreement. (*Id*. at pp. 118-23, 127-28.) While FECU does not require photo identification to issue an ATM card, the credit union does require that the account holder sign an ATM disclosure agreement before obtaining an ATM card. (*Id.* at pp. 121-24.) Therefore, the white employee violated FECU procedures when she failed to obtain such an agreement from the person requesting the card. (*Id.*) Later, ATM withdrawals totaling over $17,000 were made on the account, apparently without Julia Mayfield's knowledge or authorization.

At the time the accusations of theft arose in February 2000, Goodwin's supervisor was

Jacqueline Douglas, who investigated the suspected theft and prepared a "suspicious activity report" naming Goodwin as a suspect. (*Id.* at p. 126.) Douglas did not identify any other FECU employees as suspects. (*Id.* at pp. 126-28; Pls.' Exs. 52 & 53.) Douglas subsequently submitted the suspicious activity report to the FBI in June. (Douglass Dep. at pp. 61-69.)

Understandably, Goodwin claims that FECU treated her less favorably than the white employee who issued the ATM card and violated FECU policy. Goodwin also complains that FECU retaliated against her for filing an EEOC charge by making a false report to the FBI. Goodwin points out that Douglass learned of the theft in February, immediately prepared the suspicious activity report, but did not file the report with the FBI until June, only weeks after Goodwin filed her EEOC charge. Despite the causal nexus between these two events Goodwin failed to establish an adverse employment action. For the same reason, Goodwin's disparate treatment claim also fails.

**B.     Share Draft Accounting Position Awarded to Kushner.**

Goodwin applied for the position of Share Draft Accounting Clerk ("SDAC") in March 2000. This position involved determining whether FECU should pay or return checks for insufficient funds. (Doc. 51, Ex. 17, Christie Aff. at ¶ 4.) These duties must be performed promptly on a daily basis. The posted job description for the SDAC specifically lists "[p]unctuality and a good attendance record" as "qualifications" for the position. (Christ Aff. at ¶ 5 & Ex. A.)

The uncontroverted evidence reflects that Godwin's attendance problems were not insubstantial: she missed twenty days between April 26, 1999, and July 22, 1999, twelve of those

days in April alone. (Goodwin Dep. at pp. 271-72; Nix Aff. at ¶ 12.) Anna Kushner, a white employee, had a better attendance record than Goodwin. Russell Christie recommended Kushner for the position because of her superior attendance record. (Christie Aff. at ¶ 6.)

Goodwin counters by arguing that she was more qualified for the position because of her prior training. Accepting that Goodwin's training for the SDAC position was better than Kushner's does not carry the day for Goodwin. For the Court cannot second-guess the employer's proffered reason for its decision without evidence of pretext. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997) (noting that "potential disagreement does not, without more, create a basis to disbelieve [the] employer's explanation" for the challenged conduct); *Walker v. Prudential Property and Casualty Ins. Co,* No. 99-4172, 2002 WL 459733, at * 4 (11th Cir. 2002) (agreeing that plaintiffs' absences were excused, but refusing to second-guess employer's business decision not to give plaintiff a new position because of, *inter alia*, her absenteeism problems). Thus, FECU is entitled to summary judgment on Goodwin's disparate treatment claim as it relates to the SDAC position.

**C.     Records Clerk Position & "Closet" Work Space.**

Finally, Goodwin alleges that she was treated differently than white employees because FECU assigned her "busy work" in a "closet" without a telephone or computer. In response to this complaint, FECU notes that Goodwin was moved from a position on the switchboard to a records clerk position, largely because of her absenteeism. (Douglas Aff. at ¶ 5.) This move was necessary because FECU did not have a back-up switchboard operator. Thus, when Goodwin was absent, FECU had to reassign another employee away from her normal duties to

11

cover the incoming calls. (Douglas Aff. at ¶ 5.) In contrast, Goodwin's absenteeism from the records clerk position did not necessitate reassignment and shifting of duties. (Douglas Aff. at ¶¶ 5-7.)

Prior to Goodwin's tenure in this new position, the records clerk duties were preformed by employees in the accounting department. (Douglas Aff. at ¶ 7; Douglas Dep. at pp. 140-44.) When the accounting department lost an employee, however, the remaining employees became backlogged with work. Consequently, FECU created this new records clerk position, to which the credit union assigned Goodwin. Goodwin did not need a telephone or computer to perform her duties, but she did have access to a telephone outside her work area. (*Id.*) The room in which Goodwin performed her new duties had previously been occupied by an FECU vice-president and also had been used by several member services employees, who were white. (*Id.*)

FECU is entitled to summary judgment on this claim because Goodwin failed to present evidence that she was treated less favorably than white employee switchboard operators who had absenteeism problems, or other employees whose absences from work caused a disruptive reassignment of employees and duties. In addition, Goodwin did not present evidence that some other employee who was assigned solely records clerk duties, or similar duties, enjoyed a more pleasant work space or that a more pleasant work space was available.

## IV. BETTY McCOY-ABERCROMBIE'S ADDITIONAL CLAIMS

Plaintiff Betty McCoy began working at FECU in September 1996. Prior to her employment with FECU, she had sixteen years of banking experience, primarily in teller and head teller positions. (McCoy Dep. at pp. 14-17, 22, 22-23, 28-31, 34-36, 38.) However, she sometimes performed bank management duties. McCoy also attended college for three years,

12

served in the Air Force and completed a teller training institute program. McCoy maintains that she was denied several positions by FECU because of her race.

A.   **Talledga Branch Supervisor/Manager Position.**

In 1997, FECU prepared to open a Talladega Branch Office. (Nix. Aff. at ¶ 27.) According to President Nix, FECU prefers to hire branch supervisors/managers who live in the community where the branch is located and who have ties to that community. (*Id.*)

McCoy timely expressed her interest in the position at the Talladega Branch. Nix says he did not consider McCoy for the Talladega position or any supervisory position because she was chronically late for work. (Nix Aff. at ¶ 15.) He says that he told McCoy he would not consider her for any supervisory positions until she resolved the tardiness problem because he "expected supervisors to be present when the employees in their department arrived in the morning." (*Id.*) On the other hand, McCoy has testified that Nix responded to her inquiry concerning the Talladega Branch by telling her that Talladega was "too far" away. (McCoy Dep at pp. 238-40, 241-42.) The Court judicially notes that Talladega is approximately sixty miles from Birmingham.

On March 4, 1999, FECU hired Sheila Hay-Jenkins, a white female, for the Talladega branch supervisor position. (Jenkins Dep. at pp. 7, 30.) Just four months later in August, Jenkins received a performance evaluation chastising her for tardiness. She was told that she should make "much improvement" in this area. (Jenkins Dep. at pp. 48-51.) In March 2000, Jenkins was promoted from Branch Supervisor to Branch Manager, where she assumed additional duties. (*Id.* at pp. 51, 30.)

13

Given these facts, substantial evidence exists that FECU's reasons for awarding the position to Jenkins may have been pretextual. First, while Nix says that he told McCoy she need to improve her punctuality problems before he would consider her for a promotion, McCoy has sworn that the only reason he gave her for his denial of the Talladega position was the distance involved. Additionally, FECU promoted Jenkins from branch supervisor to branch manager, despite her tardiness problems. There is no evidence that Jenkins' tardiness problem improved prior to the promotion. These disputed facts preclude the Court from granting summary judgment on this claim.

**B.     Other Job Vacancies.**

McCoy also complains about two accounting positions FECU did not award to her. First, FECU awarded an accounting position to Stephanie Cole. However, McCoy admits that she withdrew her bid for that position prior to discovering that Cole had been awarded the position. (McCoy Dep. at pp. 325-26.) Thus, McCoy's challenge to FECU' selection of Cole is without merit.

Next, McCoy complains about an accounting position awarded to Tara England. McCoy admits that she did not apply for the position and she does not provide any explanation which might excuse her failure to do so. (McCoy Dep. at p. 325; s*ee id.* at 226, 248, 249, 325.) For example, McCoy did not testify that FECU failed to post the job-vacancy. Thus, she is not entitled to pursue this promotion claim.

14

### C. Head Teller Position.

McCoy also complains that FECU did not promote her to the head teller position. However, FECU contends that it did not have a "head teller" position between 1996 and 2000, when Plaintiffs initiated the present lawsuit. (Nix Aff. at ¶ 7.) During the interim period, FECU contemplated reinstating the position and moved an employee, Karen Rowe, from accounting to the teller line to assist tellers who might have operational questions. However, Rowe continued to maintain her accounting duties, did not actually supervise the tellers and did not receive a pay raise. After approximately two weeks, FECU moved Rowe back to accounting. (*Id.*)

There is no contrary evidence. Therefore, FECU is entitled to summary judgment on the head teller promotion claim.

### V. WANDA JACKSON LEVINS' ADDITIONAL CLAIMS

### A. Vault Teller Duties.

Levins complains that she was demoted from the "vault teller" position and her duties were inexplicably given to Anna Kushner. In addition to her normal duties as a teller, Levins also worked as the "vault teller." As such, she distributed money from the vault and "counted" money in the vault. (Levins Dep. at pp. 29-30.) After Levins was stripped of the vault teller duties, her compensation did not decrease. (*Id.* at pp. 62-63.) There is no evidence that Kushner, or other vault tellers, were compensated at a higher rate than Levins after she was relieved of these duties. Additionally, there is no allegation that the vault teller's duties involved more highly prized skills which may have made her more attractive for promotion. According to Lewis, the vault teller position merely required "a lot of concentration, a lot of trust. It was a lot

of work." (Levins Dep. at pp. 55, 56.) Under these circumstances, Plaintiff has failed to show that the removal of her vault teller duties constituted an adverse employment action.

B.  **Loan Department Positions**.

Levins complains that she was denied two loan department positions. She applied for a loan receptionist position in the spring of 2000. The position was never filled, however. (Levins Dep. at pp. 65-66.) Based on this undisputed fact, Defendants are clearly entitled to judgment as a matter of law on this claim.

Plaintiff also complains about the denial of a loan department position which was awarded to Kushner. The vacancy was not posted and Plaintiff was not aware of the vacancy until after it had been filled. (*See* Levins Dep. at pp. 96-99.) Thus, the motion for summary judgment on this claim will be denied.

## VI. DEFENDANT'S MOTION TO STRIKE

Defendants have moved to strike portions of the Plaintiffs' affidavits, on the ground that certain statements are not based on personal knowledge. Defendants' motion is moot, as the Court did not rely on the challenged information contained in the affidavits when finding the facts and reaching the conclusions in this opinion.

## VII. CONCLUSION

Based on the foregoing undisputed facts and analysis:

1)  Defendant Steve Nix is entitled to summary judgment on all claims, except those arising

under 42 U.S.C. § 1981;

2) Defendant Board of Directors of the First Educators Credit Union is entitled to summary judgment on all claims;

3) Defendants First Educators Credit Union and Steven Nix are entitled to summary judgment on:

    a) Plaintiffs' outrage claims under Alabama law,

    b) Plaintiffs' negligent supervision, training and retention claims under Alabama law,

    c) all disparate pay claims,

    e) all retaliatory discharge claims,

    f) Plaintiff Lenora Goodwin's disparate treatment and retaliation claims relating to the theft allegations, her claim for denial of the March 2000 Share Draft Accounting position and her claim regarding her assignment to the Records Clerk position,

    g) Plaintiff McCoy's claims for the accounting position awarded to Stephanie Cole and Tara England, as well as McCoy's claim for the head teller position; and

    h) Plaintiff Levins' claims for the vault teller position and the March 2000 loan department position.

Otherwise, Defendant's Motion for Summary Judgment will be denied. The Motion to Strike is moot.

These conclusions will be embodied in a separate order.

Done this 30th day of September, 2002.

/s/ U. W. Clemon
Chief United States District Judge
U. W. Clemon

Done this 30th day of September, 2002.

/s/ U. W. Clemon
Chief United States District Judge
U. W. Clemon